IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

MARK W. GRIMES                                      :

          Plaintiff                              :

v.                                                          :          Case No.: 1:13-cv-00935-CCB

PATRICK DUNNIGAN, et al.                    :

          Defendants                        :

_____

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Plaintiff, Mark W. Grimes, by Robert J. Zarbin, and the Zarbin Law Firm, LLC, in opposition to the Motion of Defendant Heidi Long, Trading as Pennwood Shows', Motion to Dismiss Plaintiff's Complaint with Prejudice or, in the Alternative for Summary Judgment, for the following reasons:

**INTRODUCTION/STANDARD OF REVIEW**

Plaintiff, Mark Grimes, sued Defendants, Patrick Dunnigan and Heidi Long.  In a four count Complaint, he alleges that he was beaten by Defendant Dunnigan. Counts I (Assault), II (Battery).  Ms. Long is sued because she owned and operated an unincorporated company known as "Pennwood Shows," (hereinafter "Pennwood"), a business that "provides carnival rides, attractions and amusements for local county and private carnivals, fairs, and bazaars in the mid-Atlantic area."  Long Affidavit ¶4.  Per the Complaint, Ms. Long is alleged to be Mr. Dunnigan's employer, Complaint ¶13; as such, she is either vicariously or directly liable for Mr. Dunnigan's tortious conduct.  Counts III (respondeat superior), IV (negligence).

To date, only Ms. Long has been served.  On information and belief, Mr. Dunnigan is currently in a Pennsylvania Penitentiary for a parole violation believed to arise out of the unlawful conduct at issue here.

Defendant, Heidi Long, Trading as Pennwood Shows, seeks dismissal for "failure to state a claim upon which relief can be granted," F. R. Civ. Proc. 12(b)(6), or, in the alternative, summary judgment pursuant to F. R. Civ. Proc. 56.  These Rules permit the Court to decide purely legal issues, when the factual record is undisputed.  Each requires that the Court resolve all factual disputes in favor of the non-moving party, and likewise afford the non-moving party the benefit of all inferences stemming from those facts.  Gerner v. County of Chesterfield, 674 F.3d 264, 266 (4th Cir. 2012) (motion to dismiss); Webster v. United States Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012) (summary judgment).  As such, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A party opposing a motion for summary judgment can demonstrate the existence of factual dispute by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Mr. Grimes has attached two affidavits, one from himself and another from Greg Hannagan, Esquire. Also included are pages from a transcript of a December 11, 2012 hearing before the Maryland Workers' Compensation Commission. At that time, Ms. Long testified under oath and was represented by counsel.

Additionally, the "question whether the act of the servant complained of was in furtherance of the master's business, within the scope of the servant's employment, is generally one of fact to be determined by the jury." Hopkins Chemical Co. v. Read Drug & Chemical Co., 124 Md. 210, 214 (1914). Scope of employment only "becomes a question of law for the court . . . if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment." Tall ex rel. Tall v. Board of Sch. Comm'rs, 120 Md. App. 236, 257 (1998).

## FACTUAL BACKGROUND

The second section of Defendant's Motion offers what she believes are "Undisputed Facts," as though her side of the story was universally accepted. Her sworn affidavit has Mr. Grimes arriving on site, and volunteering to help her park her house trailer. Long Affidavit ¶15, 16. She casts Mr. Dunnigan, whom she claims was hired for the limited purpose of setting up a single ride, Long Affidavit ¶5, as an off-duty cookout attendee. Long Affidavit ¶17. Then, she has Dunnigan leaving his picnic meal, "without being asked and/or directed" by her, to "direct Mr. Grimes into the parking space." Long Affidavit ¶20. Shortly after Mr. Dunnigan came to help, she swears, it was Mr. Grimes who exited the vehicle and "began shouting at Mr. Dunnigan." Long Affidavit ¶21. A "fight ensued," Long Affidavit ¶ 22, she says, without identifying who threw the first blow.

Mark Grimes, by affidavit, disputes virtually every material fact in Ms. Long's affidavit – especially her under-oath claim that she had "not experienced any problems with Mr. Dunnigan."  Long Affidavit ¶6.

Mr. Grimes, not a passing acquaintance, indicates he worked a number of carnivals for and with Ms. Long in 2011.  Among his duties were using his truck or a Pennwood truck to tow the company's office trailer to and from fairs.  Grimes Affidavit ¶6.  So too, he would assist with the set-up and operation of equipment and a cotton/candy apple booth.  Grimes Affidavit ¶7.  This included traveling to buy apples while a carnival was operating; Grimes learned of the need to buy apples because "he was there every night at the carnival and he was talking to [Ms. Long] all the time." Transcript at 72.

Over the two years that he worked with Pennwood, Mr. Grimes was well acquainted with Mr. Dunnigan.  Ms. Long introduced him as her company's "maintenance supervisor."  Grimes Affidavit ¶20.  The maintenance supervisor not only worked for Ms. Long, but, during the carnival season, he lived on her property. Transcript at 74. That Ms. Long cloaked Dunnigan with the supervisory authority was confirmed when, on a number of occasions, in the presence of Ms. Long, Grimes Affidavit ¶22, Mr. Dunnigan instructed Grimes where to position equipment.  Grimes Affidavit ¶22.  At no time did Ms. Long countermand Mr. Dunnigan's orders.  Grimes Affidavit ¶22.  In fact, lest there be any doubt as to the authority Ms. Long conferred, when she was questioned where to locate the trailer or equipment, Ms. Long told him to "ask Mr. Dunnigan." Grimes Affidavit ¶23.

With regard to Mr. Dunnigan's character it will be "interesting" to hear Ms. Long explain the factual basis for her claim that he had never "experienced any trouble with him. Long Affidavit ¶6. Prior to working for Pennwood, Mr. Dunnigan was serving a prison sentence in Pennsylvania for driving while intoxicated and assaulting a female police officer. Grimes Affidavit¶15. Ms. Long was aware of this, because she had signed paperwork with the Pennsylvania parole authority. Grimes Affidavit ¶14. Presumably, Ms. Long was made aware of Mr. Dunnigan's criminal record, when she executed the paperwork necessary to afford him parole. Grimes Affidavit ¶16. So too, she was no doubt informed that, as a condition of parole, he was barred from drinking alcoholic beverages. Grimes Affidavit¶18.

Regarding Mr. Dunnigan's interaction with Pennwood, Ms. Long was present when he drank alcoholic beverages, in violation of the parole order. Grimes Affidavit ¶19. In fact, she drove him to stores, so he could buy beer. Grimes Affidavit ¶19. Not only was she aware that he was violating parole, but she became aware on at least one occasion that he assaulted a co-worker. Grimes Affidavit ¶17. In fact, Greg Hannigan, a lawyer and long-time family friend, after learning of the co-worker assault and the unlawful drinking, specifically told Ms. Long, prior to the events giving rise to this suit, that Mr. Dunnigan's drinking and violent propensities posed a risk to co-workers and the public in general. Affidavit of Hannigan ¶¶7, 8.

Turning to the ill-fated carnival where the occurrence happened, Ms. Long asked Mr. Grimes if he would work a September 2011 carnival in LaPlata, Maryland; at the time she and Grimes were working together at a fair in Woodstock, Virginia. Grimes Affidavit¶ 7. Specifically, she not only needed his help towing the officer trailer,Grimes

Affidavit ¶26, but he would be required to remain on site for the duration of the carnival

to assist with the operation of a cotton candy/candy apple booth.  Grimes Affidavit ¶7.

Mr. Grimes accepted the offer.  Grimes Affidavit ¶ 8.  During the weeks between the

Woodstock and LaPlata events, Ms. Long and Mr. Grimes discussed the details of the

September event. Grimes Affidavit ¶9.  Both he and Long would use separate rooms in

the office trailer as their residence.  Grimes Affidavit¶ 10.  Other Pennwood employees,

r. Dunnigan included, would live on-site, in separate trailers. Grimes Affidavit ¶11.[1]

On September 14, 2011, as agreed, Mr. Grimes hitched his truck to the

Pennwood trailer and drove to the location where the LaPlata fair was scheduled to take

place.  Grimes Affidavit ¶25.  Notably, Mr. Grimes and Ms. Long had driven to the

facility, transporting the cotton candy/candy apple booth.  Grimes Affidavit ¶32.  On that

occasion, Mr. Dunnigan met his truck, and directed, in Ms. Long's presence, where he

wanted Mr. Grimes to position the cotton candy/candy apple booth.  Grimes Affidavit

¶30, 34.

In contrast to her affidavit claim that Mr. Grimes appeared in LaPlata and offered

to park her trailer, Ms. Long testified at the Workers' Compensation Commission that

she and Mr. Grimes met that morning in Gettysburg Pennsylvania.  Grimes hitched his

truck to the trailer, and Ms. Long drove separately in company truck.  Transcript at 72.

The two drove together to Frederick, Maryland, where they intended to buy apples.

Transcript at 72.   Arriving there, they parked Grimes' truck and proceeded to the fruit

merchant in Long's vehicle.  Transcript at 72.   After buying the apples, it was agreed

---

[1] On information and belief, owing to his DWI conviction, Mr. Dunnigan had no driver's license. Grimes Affidavit ¶33.  Hence, it is unclear how Ms. Long has him showing up for a picnic-style meal, as though he had come from somewhere off-site to partake, off-duty, of a communal meal.

that Mr. Grimes would follow Ms. Long to LaPlata, since "he didn't know how to get there."  Transcript at 72.

Upon his arrival, Mr. Grimes was met by Ms. Long, who directed him to the general area where the trailer would be parked.  Grimes Affidavit ¶¶ 28, 29.  When they arrived at that location, Mr. Dunnigan, can of beer in hand, Grimes Affidavit ¶35, approached Grimes' truck, and began directing him where to put the trailer. Grimes Affidavit  ¶30.  Ms. Long was present when this happened, and said nothing that led Mr. Grimes to believe Mr. Dunnigan was doing anything other than what he had one on behalf of Pennwood in the past – directing where the trailer would parked. Grimes Affidavit ¶30, 32.  When it became apparent to Grimes that the trailer would not fit where Dunnigan was directing him to park it, he communicated his concerns to Mr. Dunnigan.  Grimes Affidavit ¶37.  Mr. Dunnigan responded with profanity, leading Ms. Long, who was apparently present for this exchange, to instruct her maintenance supervisor to allow Grimes to park the trailer on his own. Grimes Affidavit ¶38.  The profanity from Dunnigan continued, prompting Mr. Grimes to approach him, and ask if had a problem. Grimes Affidavit ¶39, 40.  Dunnigan responded to this verbal request, with an un-provoked beating.Grimes Affidavit ¶41, 42.

**ARGUMENT**

A.  <u>Vicarious Liability – Foreseeable Attack by an Intoxicated Violent Felon.</u>

In Count III, the Plaintiff alleges that, Ms. Long, doing business as Pennwood, is responsible to the beating administered by her maintenance supervisor.  Complaint ¶13. Recently, the Court of Appeals offered the following summary of this doctrine of vicarious liability:

7

This Court has recognized consistently the doctrine of respondeat superior, as "it is hornbook law that an employer is ordinarily responsible for the tortious conduct of his employee committed while the servant was acting within the scope of the employment relationship." [citations omitted]  The doctrine is based on the principle that "[b]ecause 'the master holds out his servant as competent and fit to be trusted, . . . he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment.'" [citations omitted]. We have stated that, "[f]or an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." [citations omitted].

Barclay v. Briscoe, 427 Md. 270, 282-283 (2012).

Here, the Defense offers two grounds to support its claim that the Plaintiff cannot state a claim for respondeat superior:  course of employment and intentional act.

Turning to the first, there is no disputing that Mr. Dunnigan was a Pennwood employee.  The Defense would have the Court believe he merely operated a piece of equipment, and that, having accomplished his limited assignment the day before, he was merely on-site to attend a picnic.  Mr. Grimes, in contrast, asserts that Mr. Dunnigan was present, and doing what he had done in the past: giving instructions regarding the positioning of the trailer.  For "an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer."  S. Mgmt. Corp. v. Taha, 378 Md. 461, 481 (2003).  Notably, use of the term "authorized", does "not mean authority expressly conferred [by the employer], but whether the act was such as was incident to the performance of the duties entrusted to the employee by the employer."  Id.  The "simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to be authorized by him.'"  Wood v. Abell, 268 Md. 214, 227 (1973).  "[A]n important factor is whether the

employee's conduct was 'expectable' or 'foreseeable.'" <u>Felland L.P. v. Digi-Tel</u>
<u>Communs. LLC</u>, 384 Md. 520, 533 (2004).

    Assuming Grimes is believed, Mr. Dunnigan was doing precisely what Ms. Long
had authorized him to do in the past.  That he was acting on her behalf is borne out not
only by the prior course of conduct, but by the events out of which this case arises.
Namely, Mr. Dunnigan, in the presence of his employer, appears, can of beer in hand,
and begins instructing Mr. Grimes.  Yet, at no time, does Ms. Long call Mr. Dunnigan
off, until it is apparent that Mr. Grimes disagrees with the maintenance supervisor's
instructions.

    As such, construing the facts and inferences most favorably to Mr. Grimes, there
is a dispute of material fact as to whether Mr. Dunnigan, assuming he was in fact the
maintenance supervisor, was on duty and acting on his employer's behalf.

    Turning to the intentional acts issue, Defendant believes that she is insulated
from vicarious liability because Mr. Dunnigan's criminal conduct cannot be imputed to
her, as a matter of law.With regard to "cases involving intentional torts," the Court of
Appeals "has emphasized that where an employee's actions are personal, or where
they represent a departure from the purpose of furthering the employer's business, or
where the employee is acting to protect his own interests, even if during normal duty
hours and at an authorized locality, the employee's actions are outside the scope of his
employment."  <u>Sawyer v. Humphries</u>, 322 Md. 247, 256-257 (1991).  And, "[w]here the
conduct of the servant is unprovoked, highly unusual, and quite outrageous,"courts tend
to hold 'that this in itself is sufficient to indicate that the motive was a purely personal
one' and the conduct outside the scope of employment." <u>Id</u>.

The Defense relies on Sawyer and Tall ex rel. Tall v. Bd. Of Sch. Comm'rs of Baltimore City, 120 Md. App. 236 (1998), which it believes stands for the proposition that an employer can never be vicariously liable for a servant's intentional acts.  Both of these cases, though, involved respondeat superior claims without any claim that the errant employee was prone to assaultive behavior.  Indeed, Tall, in a footnote, points out:

> At the outset, we note that this case does not present an issue of negligent hiring. Nor is there any contention that the Board had prior knowledge of any assaultive behavior by Manning toward students. Therefore, we do not address whether the Board could be liable for such claims, and this opinion should not be construed to suggest that a school board could not be liable if it negligently hired a teacher or knowingly allowed an abusive teacher to remain in its employ.

> Tall, 120 Md. App. at  248.  See also Sawyer at 322 Md. 251-252 (issue was whether intentional acts within scope of employment for tort claims act – no evidence of similar prior violent conduct).

In contrast, there is ample evidence in this case that Ms. Long had every reason to anticipate that Mr. Dunnigan posed a risk to his co-workers.  Given his criminal records, unlawful alcohol consumption and prior assault on a co-worker, it was not outrageous or unexpected that another co-worker could be assaulted.  Indeed, that he was prone to violence, and that this propensity posed a risk to co-workers and the general public, was precisely the danger Mr. Hannagan warned that Dunnigan's continued employment posed.  Given that an "important factor" in scope of employment analysis is whether the errant worker's conduct was "expectable' or 'foreseeable,'" Felland L.P. v. Digi-Tel Communs. LLC, 384 Md. 520, 533 (2004), Mr. Grimes has set forth sufficient facts to generate a jury question as to whether Ms. Long has reason to anticipate or expect that Mr. Dunnigan could or would, while working for her, attack an unsuspecting co-worker or member of the general public.

This conclusion is supported not only by the factual record, but by the reasoning underling the doctrine of respondeat superior.  As the <u>Barclay</u> Court recently observed vicarious liability is premised upon the notion that "the master holds out his servant as competent and fit to be trusted, . . . he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment." 427 Md. at 282-283.  Ms. Long, when she authorized Mr. Dunnigan to supervise others, created a situation where he would have to interact with co-workers and the general public.  She "in effect" warranted that he had the "people skills" to exercise the power entrusted to him, without resorting to violence.  And, she breached this warranty when, notwithstanding warning signs and an express warning, she continue to keep in her employ a maintenance supervisor who demonstrated a violent propensities.

B.  <u>Primary Negligence – Knowingly Employing A Worker Prone To Violence.</u>

Ms. Long's claim that she had "not experienced any problems with" Mr. Dunnigan begs the question as to her definition of the word "problems."  Regarding primary negligence arising out of an employment relationship, an employer owes a duty to "use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." <u>Henley v. Prince George's County</u>, 305 Md. 320, 336 (1986).  This duty extends not only to the public with whom the worker might come into contact, but to co-workers as well.  <u>Evans v. Morsell</u>, 284 Md. 160, 164-166 (1978).  Explaining further, <u>Evans</u> explains that an employer

> owes to each of his servants the duty of using reasonable care and caution
> in the selection of competent fellow-servants, and in the retention in his
> service of none but those who are. If he does not perform this duty, and an
> injury is occasioned by the negligence of an incompetent or careless

servant, the master is responsible to the injured employee, not for the mere negligent act or omission of the incompetent or careless servant, but for his own negligence in not discharging his own duty towards the injured servant.

. . . .

That drunkenness on the part of a railroad employee renders him an incompetent servant will scarcely be disputed; nor can it be questioned that a master who knowingly employs such a servant, or who, knowing his habits, retains him in his service, would be guilty of a reckless and wanton breach of duty, not only to the public, but to every employee in his service."

. . . .

A critical standard here is whether the employer knew or should have known that the individual was potentially dangerous.

Id. at 166.

Per Mr. Grimes' affidavit, Ms. Long knew Mr. Dunnigan was a convicted criminal, with a history of violent crime.  That he continued to pose a risk was confirmed when she became aware that he had done the very act that resulted in his inarceration - assaulting a co-worker.  Moreover, Dunnigan's consumption of alcohol, in violation of his parole, cannot be ignored.  Much like the drunkenness of a railroad employee, Evans deems a "reckless and wanton breach of duty" to co-employees forced to work with the drunk, Ms. Long's continue employment of Mr. Dunnigan, knowing what she knew, risked the safety of everyone forced to work with him, including Mr. Grimes.

Notably, this risk was compounded by the fact that Mr. Dunnigan was a maintenance supervisor. By virtue of the management authority Long delegated to him, he was required to interact with other workers.  See Evans v. Morsell, 284 Md. 160, 166-167 (1978) (duty increases if employee will foreseeably come into contact with others). As the facts of this case illustrate, there are instances where the managed do not agree with the manager.  In such cases, there may be discussion and

disagreement, sometimes "testy."  When Ms. Long opted, in the face of warnings that

Mr. Dunnigan had obvious anger management issues, to do nothing, she exposed her

staff to a supervisor prone react violently when a disagreement arose.

There being an issue of fact as to what Ms. Long knew and should have known

about Mr. Dunnigan's propensity to drunken violence there is a dispute of material fact

as to Ms. Long's primary negligence.

## Additional Time to Conduct Discovery

Should the Court deem the factual record here lacking as to the viability of either

claim against Ms. Long and her company, the factual record as to what Ms. Long knew

or should have known is primarily under her control.  Additionally, there are other

sources of proof, namely the Pennsylvania parole authority, that will likely shed light on

what Ms. Long was told about the risk she was taking by signing documents that

allowed Mr. Dunnigan to be paroled.

The Federal Rules provide that if "a nonmovant shows by affidavit or declaration

that, for specified reasons, it cannot present facts essential to justify its opposition, the

court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits

or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R.

Civ. Proc. 56(d).  This Rule requires that summary judgment "be refused where the non-

moving party has not had the opportunity to 'discover information that is essential to his

opposition." Webster v. Rumsfeld, 156 Fed. Appx. 571, 576 (4th Cir. 2005).

Mr. Grimes suffered serious injury as a result of being assaulted by a co-worker.

And he has set forth facts in his affidavit that demonstrate a factual foundation for his

claim that Ms. Long knew of the risk Mr. Dunnigan posed to co-workers.

As such, if Mr. Grimes cannot prove to the Court's satisfaction that sufficient material facts are in fact disputed, he asks the opportunity to conduct discovery – before the Court determines whether he can meet his burden of proving Ms. Long's liability to him.

## CONCLUSION

Mr. Grimes has set forth disputed material facts, so the Motion to Dismiss and for Summary Judgment should be denied. In the alternative, he asks the Court to defer ruling on the Motion until the conclusion of discovery.

Respectfully submitted,


_____/s/ Robert J. Zarbin_____
Robert J. Zarbin,
Zarbin Law Firm, LLC
14503 Main Street
Upper Marlboro, Maryland 20772
301-780-9253
Attorney for Plaintiff
rzarbin@aol.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 22nd day of April, 2013, a copy of the foregoing Consent Motion to Extend Time to File Opposition to Defendant's, Heidi Long's, Motion to Dismiss or, in the Alternative, for Summary Judgment was mailed via first class mail and served via the Court's Electronic Case Filing System upon: Patrick Dunnigan, JH1180, c/o SCI Coal Township, 1 Kelley Drive, Coal Township, PA, 17866; Patrick Dunnigan, 898 Shrivers Corner Road, Gettysburg, PA 17325 and JoAnne Zawitoski, Esquire, 25 S. Charles Street, Suite 1400, Baltimore, Maryland 21201.


_____/s/ Robert J. Zarbin_____
Robert J. Zarbin